COMMONWEALTH *vs.* JOHN A. MEUSE
(and eleven companion cases[1]).

No. 93-P-1459.

Essex. March 10, 1995. - July 26, 1995.

Present: BROWN, JACOBS, & GREENBERG, JJ.

Further appellate review granted, 421 Mass. 1104 (1995).

*Practice, Criminal,* Plea, Agreement between prosecutor and witness, Argument by prosecutor.

At the trial of three defendants on indictments for armed robbery while masked, the prosecutor exceeded the permissible bounds of closing argument by suggesting that the Commonwealth had special knowledge by which it could verify the witnesses' testimony; moreover, the judge's instructions were not sufficient to overcome the prejudicial impact of the prosecutor's remarks: a new trial was required. [772-775]

In a criminal case, the cumulative effect of the prosecutor's improper vouching for the credibility of an accomplice to the crimes who had testified for the Commonwealth was so prejudicial that a new trial was required. [776-777]

INDICTMENTS found and returned in the Superior Court Department on March 4, 1992.

The cases were tried before *John L. Murphy, Jr.*, J.

*Kevin J. Mahoney* for John Meuse.

*Victor J. Koufman* for Robert L. Stephens.

*Peter M. Dempsey* for Ronald Stephens.

*Gregory I. Massing*, Assistant Attorney General, for the Commonwealth.

BROWN, J. On the evening of November 23, 1991, the Yesterday's restaurant in Peabody was robbed by three individuals, wearing masks and carrying guns. A witness testified that one of the robbers wore a white hockey mask made of hard plastic, that one wore a green Frankenstein mask and

---

[1] Four against Robert L. Stephens, four against Ronald Stephens, and three against John A. Meuse.

that the third wore a blue or black ski mask. That same witness testified that, based on his familiarity with handguns, the men were armed with a chrome-plated .357 Magnum with a long barrel, a large black semi-automatic 9mm handgun, and a small black .22 caliber pistol.

Entering the restaurant, the men ordered the employees to get on the floor. One of the employees hesitated and the robber wearing the white hockey mask struck him on the head with his gun. The robbers demanded to know the location of the safe. They moved into the dining area where one of the robbers began to empty the cash register. Approximately five minutes later the men left the restaurant through the rear door.

Each of the three defendants was indicted for three counts of armed robbery while masked, three counts of assault and battery with a dangerous weapon, one count of receiving a stolen motor vehicle, and one count of possession of a firearm without an identification card. At trial, the testimony of an accomplice, one Eric Schneider, who had pled guilty, implicated all the defendants. A jury found each of them guilty of all of the charges. For reasons that will be set out below, we are constrained to reverse their judgments of conviction.

Although it is generally acceptable for the government to introduce in evidence the testimony of an accomplice pursuant to a plea agreement, the prosecution must take care to insure that it does not vouch, explicitly or implicitly, for the credibility of such a witness. See *Commonwealth* v. *Ciampa,* 406 Mass. 257, 264-265 (1984). The *Ciampa* case warns of the dangers of using such testimony and suggests tactics geared toward reducing its possible prejudicial effect on the jury. *Id.* at 265. Based on the teaching of the *Ciampa* case, we conclude that the prosecutor exceeded the permissible bounds of closing argument.[2]

It is important for the prosecution to be able, in closing argument, to "restate the government's agreement with the

---

[2]Appellate counsel was not the trial prosecutor.

witness . . . . If, however, a prosecutor goes beyond the terms and circumstances of the plea agreement and suggests that the government has special knowledge by which it can verify the witness's testimony, reversible error may occur." *Id.* at 265. A portion of the prosecutor's argument to the jury, to which there was an objection, was as follows:

> "Take a look at that plea agreement. Sure, the Commonwealth has veto power. How would you write that agreement if you were in the Commonwealth's shoes? Who would judge Eric Schneider's credibility other than the Commonwealth? The Commonwealth means not me but the State Police. Because if Eric Schneider is not telling the truth, we have an army of police that can go out and corroborate every detail he is giving us. If he gives us one wrong detail we will say: Eric, you are not telling the truth here. Tell us the truth. That's the bargain. If you don't that's when we will not show up for sentencing. That's the leverage we have over Eric Schneider."

This type of argument is exactly what the court in *Ciampa* disapproved.

We now must look to see whether the judge's instructions to the jury were sufficient to overcome the prejudicial impact of the prosecutor's argument. The judge instructed the jury:

> "We had a witness, Eric Schneider, that testified, and the testimony was that he pled guilty to crimes that arose out of this same incident. Mr. Schneider's guilty plea is not evidence against the other four defendants, and you are only to consider that testimony in determining the believability or credibility of Mr. Schneider. You should consider his testimony with caution and give it such weight as you feel it deserves in this case.
>
> "There was also evidence presented to you that Mr. Schneider, through his attorney, made an agreement with the Commonwealth. . . . In evaluating Mr. Schneider's testimony, you should consider whether the testi-

mony that he gave you had been influenced by representations that were made to him by the Commonwealth in exchange for his testimony."

We think the judge's instructions were insufficient. *Ciampa* requires the judge to tell the jury that by entering into the agreement and presenting Schneider as a government witness, the Commonwealth neither knew whether nor warranted that he was telling the truth. *Id.* at 264-265, 266.

The judge also gave a general instruction regarding vouching for one's witness. He told the jury:

> "It is improper for any attorney — and it was done in argument — to vouch for the credibility of their [sic] witness. There is only one route that determines the credibility of anybody. It is not the Judge, it is not the clerk. It is the jury. You alone are charged with the task of deciding what is credible evidence and what is not credible evidence.

> "There was a remark made that the Commonwealth can use the police force or something to determine whether Mr. Schneider is telling the truth. That is not my business and it is not your business. They may or may not do that, but that is not involved in the case. It is your responsibility to determine whether or not he is telling the truth. What happens after that is no concern of mine and it is no concern of yours, and I suggest that you not even discuss it when you go to the jury room. If you remember the contents of that remark, please disregard it."

Again, the judge failed to point out to the jury that the Commonwealth, by presenting Schneider as a government witness, did not know and could not warrant that he was telling the truth. Thus, the prosecutor's error in his closing argument, combined with the judge's failure to instruct adequately the jury, require reversal of the convictions of the three defendants.

In addition to the remarks discussed above, at other junctures in his closing argument, the prosecutor expressed to the jury that his witness was telling the truth. He argued, for example:

> "Why would he name somebody like that and have another guy after him unless it was true? Why wouldn't he just come up with Charlie Gaglione or somebody?
>
> "Sure, the cops want the fifth guy, I'll come up with some name. Why? Because it was true.
>
> "Why would Eric Schneider walk out that day prior to the time he testifies? For two reasons: One, to make sure he would come into court and hold up his end of the bargain to come in and tell the truth, the whole truth; and number two, his own personal safety.
>
> "Does it make sense that this case was based on some kind of a diabolical scheme by the Attorney General's Office and the State Police so we can get the wrong people? That just doesn't wash. Why? For what reason? We have plenty of better things to do than this one case, to frame four people.
>
> "If he wanted to lie, he should have taken up Bobby Stephens and John Meuse's suggestion and he should have named John Moore and Charlie Gaglione.
>
> "He knew his only way out of jail was to tell the truth.
>
> "After you . . . [evaluate his testimony] you can only reach one conclusion, that he told the truth."

These other references to Schneider's credibility, when viewed in isolation, may not warrant reversal; however, their cumulative effect provides additional bases for reversal of the defendants' convictions.[3] See *Commonwealth* v. *Burke*, 373

---

[3]In an unrelated instance, to which a timely objection was made, the prosecutor, referring to items seized from defendant Meuse's apartment and van, stated:

> "Now, who carries in his wallet, in his van, a fake license? What kind of person does that, an upstanding citizen or someone who robs restaurants for a living?"

Mass. 569, 577 (1977) (while "neither of the improper remarks, standing alone, was sufficiently egregious to constitute ground for reversal[,]. . . the 'prejudicial impact of the prosecutor's charge should be assessed by looking at the combined effect of all his errors'" [citations omitted]). See also *Commonwealth* v. *Loguidice*, 420 Mass. 453 (1995).

*Judgments reversed.*
*Verdicts set aside.*