## COMMONWEALTH *vs.* THOMAS CALDWELL.

Hampden. December 10, 2010. - April 8, 2011.

Present: IRELAND, COWIN, CORDY, BOTSFORD, & GANTS, JJ.[1]

*Practice, Criminal,* Instructions to jury, Argument by prosecutor, Agreement between prosecutor and witness, Public trial, Continuance, Argument by counsel, Assistance of counsel, Capital case. *Evidence,* Prior misconduct. *Witness,* Credibility. *Constitutional Law,* Public trial, Assistance of counsel. *Joint Enterprise. Felony-Murder Rule.*

At a murder trial, the testimony of a witness that twice referred to prior drug dealing by the defendant was not so unfairly prejudicial as to violate the defendant's right to due process, where the judge immediately struck the first reference and instructed the jury to ignore it, and where, although the judge misspoke in not striking the second reference, the judge plainly meant to strike it and the jury would have understood from the context that the judge was striking the reference; moreover, even if the jury understood the judge to mean that the second reference was not struck, it could be said with fair assurance in view of the overwhelming evidence of the defendant's guilt that the jury's verdict was not substantially swayed by the testimony. [277-279]

At a murder trial, a prosecutor's statements during closing argument regarding a witness who testified under a plea agreement, which were made after defense counsel placed the witness's credibility in question through cross-examination and closing argument, were a reasonable and proper argument that the witness would not risk lying under oath, because the consequences of a breach were too great; moreover, there was no material risk that any juror would have implicitly understood that the prosecutor knew from information outside the evidence that the witness was telling the truth. [279-281]

At a murder trial, a partial closure of the court room that took place when several spectators were removed from the court room did not violate the defendant's right to a public trial under the Sixth Amendment to the United States Constitution, where the judge's finding that the spectators removed from the court room had threatened a court officer with bodily harm provided substantial cause to remove them; where the partial closure was no broader than necessary to protect the interest of court safety and security, given that only the spectators who made the threats were removed; where there was no apparent reasonable alternative other than to remove the person or persons who made the threats; and where, although the judge's findings were not as comprehensive or precise as is desirable, they were adequate in the circumstances. [281-284]

[1]Justice Cowin participated in the deliberation on this case, but retired before the opinion was issued.

At a murder trial, the judge did not abuse his discretion by denying defense counsel additional time to prepare his closing argument. [285-286]

There was no merit to the claims of a criminal defendant that the judge erred in admitting in evidence tape-recorded telephone conversations between the defendant and a witness who testified at trial under a plea agreement, given that the defendant was not in custody when those conversations took place, and therefore the defendant had no right to Miranda warnings or to counsel under the Fifth Amendment to the United States Constitution or art. 12 of the Massachusetts Declaration of Rights [286-287]; that the judge erred in instructing the jury that they could find the defendant guilty under a joint venture theory based on a preponderance of the evidence rather than by proof beyond a reasonable doubt, given that the judge gave no such instruction [287]; or that the judge erred in instructing the jury on felony-murder in the first degree, given that masked armed robbery, the felony underlying the charge of felony-murder, was punishable by life imprisonment [287-288].

INDICTMENTS found and returned in the Superior Court Department on February 15, 2007.

The cases were tried before *Peter A. Velis*, J.

*Leslie W. O'Brien* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

GANTS, J. A jury in the Superior Court convicted the defendant on two charges of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony murder for the shooting deaths of Nathan Lewis and Kevin Thompson. The defendant was also convicted of assault and battery by means of a dangerous weapon, armed assault with intent to rob, possession of a firearm in the commission of a felony, and on three charges of armed robbery while masked.[2]

On appeal, the defendant argues that he should be granted a new trial because (1) the prosecutor elicited twice from a witness that the defendant was a drug dealer, which testimony the judge ordered struck; (2) the prosecutor improperly suggested in his closing argument that the Commonwealth knew whether a

---

[2]The defendant was sentenced to two consecutive life terms on the murder convictions, life terms on each of the three convictions of masked armed robbery, from nine to ten years in State prison on each of the convictions of assault and battery by means of a dangerous weapon and armed assault with intent to rob, and from eighteen to twenty years in State prison on the conviction of possession of a firearm in the commission of a felony.

cooperating witness was telling the truth by arguing that the witness would not risk getting "caught in a lie" because lying would constitute a violation of his plea agreement; (3) the judge violated the defendant's right to a public trial pursuant to the Sixth Amendment to the United States Constitution by ejecting some of the defendant's family members and supporters from the court room during sentencing without having made findings that would justify a partial closure of the court room; and (4) the judge denied defense counsel adequate time to prepare his closing argument. Under *Commonwealth v. Moffett*, 383 Mass. 201 (1981), the defendant filed a pro se brief arguing that the judge erred in (1) admitting in evidence tape recorded telephone conversations between the defendant and a cooperating witness where the cooperating witness was acting as an agent of the government and the defendant was without benefit of counsel; (2) instructing the jury on joint venture; and (3) not instructing the jury on felony murder in the second degree. We conclude that the judge's rulings were either not error or not prejudicial error, and affirm the defendant's convictions. After a complete review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his murder convictions to a lesser degree of guilt or to order a new trial.

*Background.* Based on the evidence at trial, the jury could have found that, on the evening of December 11, 2006, Osbourne Myrie and Raymond Lucia were renovating the first-floor apartment of a three-family home at 92 Marlborough Street in Springfield owned by Nathan Lewis. At approximately 7:15 p.m., while Myrie was cutting tile in the bathroom, and Lewis, Lucia, and Lewis's friend, Kevin Thompson, were in or near the dining area, two masked men entered the dining area of the apartment and a third masked man ran down the hallway of the apartment toward the bathroom. The third masked man confronted Myrie in the bathroom with a firearm and pipe, and then walked away. Another masked man, also armed with a firearm, then approached Myrie and demanded money. Myrie told him he was working and had no money, and the man left the bathroom. Myrie looked into the dining area, heard what sounded like a gunshot, and hid in a corner of the basement.

In the dining area, Lewis, Thompson, and Lucia emptied their pockets, but the intruders kicked Lucia, asking him, "Is that all you got?" As the intruders headed toward the front door, one said, "I'm not leaving here without shooting somebody," and then shot Lewis three times, once in the head. The man then shot Thompson and Lucia once in the back and left.[3] Lewis and Thompson died as a result of their gunshot wounds, but Lucia survived and testified at trial.

The first emergency 911 telephone call to the Springfield police regarding the incident was received at 7:26 P.M. Also at 7:26 P.M., Willie Sherrod, a friend of the defendant, telephoned the defendant, who said that he was "tied up doing something," and would call Sherrod back. Later that evening, the defendant returned the telephone call, and told Sherrod that he "just pulled a jux" and that "he might have merced someone." Sherrod explained that "jux" and "merced" were words used in "street talk," and that "pulling a jux" means to commit a robbery, while "mercing" someone means to kill someone. Still later that evening, Sherrod spoke again by telephone with the defendant, who explained that, during the robbery, "the dude tried to grab" him, so he "shot him in the stomach," and when "the dude tried to run," he "shot him in the back," and when the "dude" acted like "he was reaching for something," he "shot him in the back of the head." The defendant also said that he had committed the robbery with "Chuck" and Chuck's brother on the "spur of the moment," and that he got "straight money" of about $14,000. The defendant said that he was going to split the money and get out of town.

That evening, the defendant telephoned Jamesha Little, the mother of his child, and told her, "Do me a favor. Pack my stuff." When she asked what happened, he said, "Nothing. Just pack my stuff," and explained that he wanted her to pack all of his clothes, both dirty and clean. She placed all his clothes in a suitcase, but the defendant did not come by that night to retrieve them. When she asked him the next day where he had spent the night, he said he stayed at Chuck's house.

---

[3] A ballistics expert, Sergeant John Crane of the Massachusetts State police, testified that five nine millimeter Ruger cartridge casings were recovered at the scene, and all were fired from the same Cobra semiautomatic pistol.

Chuck, identified as Charles Reed, the defendant's best friend, had dropped off Shannon Hottin, the mother of his child, at her parents' home in Springfield after Hottin got off work at 5 P.M. on December 11, and left in her motor vehicle, a Honda Accord.[4] He did not return to Hottin's parents' house until some time after 8:19 P.M. Reed was residing in December, 2006, at his grandmother's house at 98 Marlborough Street in Springfield, a few doors down the street from the shootings. On December 12, 2006, at 3:27 P.M., according to videotape surveillance, the defendant was with Reed at the Mohegan Sun Casino in Connecticut.

On December 12, Joseph Beany was checking dumpsters in search of cans and bottles in order to collect the recycling deposit. In one dumpster behind an apartment house in Springfield, he found a bag that contained a wallet with no cash, keys, a pair of boots with a red brown stain on one of them, a pair of pants, and a shirt. He left the boots, pants, and shirt in the dumpster, but placed the wallet and keys on top of a recycling bucket. Later that day, Gail Archie found the wallet and keys, called a telephone number she found in the wallet, and agreed to bring the wallet and keys to the police station, which she did. On the morning of December 13, a Springfield police sergeant retrieved a pair of tan boots and blue jeans from the dumpster behind the apartment house.[5]

Elizabeth Levandowski, a deoxyribonucleic acid (DNA) analyst with the Massachusetts State police, tested a cutting from the left leg of the jeans that contained the reddish brown stain and obtained a complete DNA profile, which she compared to the DNA profile for Lewis, Thompson, Lucia, and the defendant. She determined that Lewis "could have been the source" of the DNA, and that the probability of a randomly selected individual having that same DNA profile is approximately one in 2.31 quadrillion of the Caucasian population; one in 1.339

[4]On December 22, 2006, Lynn Orvis, a criminalist with the Massachusetts State police, examined the Honda Accord automobile and saw no visible reddish brown stains, but various areas of the motor vehicle tested positive for the presence of blood.

[5]Jamesha Little testified that the boots and jeans recovered from the dumpster were "just like" the boots and jeans the defendant owned.

quadrillion of the African-American population; and one in 3.497 quadrillion of the Hispanic population.[6]

Levandowski also tested the boots and jeans for "wearer" DNA, examining swabs taken from the inside of the boots and the "wear areas of the inside of the jeans," and obtained only a partial DNA profile. The partial DNA profile from the inside of the boots was a mixture of DNA from at least three individuals. The defendant was included as a potential contributor in this DNA mixture, Thompson and Lucia were excluded as possible contributors, and the results for Lewis were inconclusive. The probability of a randomly selected individual having contributed DNA to this mixture is one in 686 of the Caucasian population, one in 757 of the African-American population, and one in 1,200 of the Hispanic population.[7]

Meanwhile, on December 12, Sherrod decided to inform the Federal Bureau of Investigation's Gang Task Force about the information he had learned from the defendant in their telephone conversations the previous evening. Unbeknownst to the defendant, Sherrod at the time of those telephone calls had been working as a Federal informant and cooperating witness after executing a plea and cooperation agreement in May, 2006, with the United States attorney's office for the District of Massachusetts. Under that agreement, Sherrod agreed to plead guilty to an indictment charging him with possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (2006). The agreement stated that conviction under that statute carried a minimum mandatory term of ten years in prison, followed by a minimum of eight years of supervised release, and a maximum term of life in prison. He also agreed to cooperate fully with law enforcement agents and government

[6]The deoxyribonucleic acid (DNA) analyst also obtained a DNA profile from a reddish brown stain on the toe of the left boot, which indicated the presence of a mixture of DNA from more than one source. The profile of the major source of the DNA matched the known DNA profile of Nathan Lewis. Kevin Thompson, Raymond Lucia, and the defendant were excluded as a source of the major profile in the DNA mixture.

[7]The defendant is African-American. The defendant and Lewis were each included as potential contributors to the DNA mixture found in the swabs taken from the "wear areas" inside the jeans, but the probability of a randomly selected unrelated individual having contributed DNA to this mixture is approximately one in two for each of the three populations.

attorneys to "provide complete and truthful information to all law enforcement personnel," and, if his testimony were requested, to testify "truthfully and completely."[8]

After informing the authorities about the telephone calls, Sherrod received another telephone call from the defendant on the evening of December 13, in which the defendant asked for help in obtaining "a couple of guns." Sherrod then made three telephone calls to the defendant, which were recorded. In one, he asked the defendant if he still had the gun he had used when he "merced" someone. When the defendant said he did, Sherrod said he knew someone who was willing to trade another firearm for the defendant's firearm, "and the dude don't know nobody got merced." The defendant, however, was unwilling to trade his firearm for a different one.

The defendant was arrested on December 16 and, after waiving his Miranda rights and his right to a prompt arraignment, provided both a tape-recorded and written statement to the police. He admitted to being at 87 or 91 Marlborough Street at 4:20 P.M. on December 11, but said he left before 5 P.M., and was in Little's apartment between 6:30 and 8:30 P.M. Little, however, testified that the defendant was not at her home between 6 and 8 P.M. on December 11.

*Discussion.* 1. *The struck testimony regarding the defendant's sale of drugs.* In the direct examination of Sherrod, the prosecutor asked how he met the defendant. Sherrod replied that they "just basically hung in the same neighborhood, and he was kind of like selling drugs . . . at the time I was selling drugs and selling on the same street basically." When defense counsel asked to be seen at sidebar, the judge instructed the jury:

> "The court will take that posture as an objection and a motion to strike. 'He was kind of selling drugs himself' and what followed with respect to any involvement on the drugs on the defendant . . . will be ignored by the jury as not evidence in this case. It will be ignored by the jury as if not spoken. In all other respects, this gentleman's testimony will stand."

---

[8]When asked why he waited to tell the police about his conversations with the defendant, Sherrod explained that the defendant was his friend but, after thinking about it, he recognized that it was "the right thing to do to just tell on him."

Moments later, the prosecutor asked Sherrod if he knew how the defendant made money between the time he met him (which Sherrod had said was 1998 or 1999) and 2006, requesting a "yes or no" answer. After Sherrod answered, "He sold drugs," the defendant objected, and the judge sustained the objection. After the prosecutor asked to approach at sidebar, the judge told the jury:

> "The court on its own motion prior to the approaching is striking the evidence. If I hear something at sidebar with respect to that ruling, I will either modify, rescind, or leave it intact. In all other respects, the testimony other than the response, 'him selling drugs' shall be struck from the record."

The defendant argues that the testimony of the defendant's drug dealing was so unfairly prejudicial as to violate his right to due process even though the evidence was struck. We disagree.

As to the first reference to the defendant's drug dealing, the judge immediately struck the testimony and instructed the jury to ignore it. "Jurors are presumed to follow a judge's instructions, including instructions to disregard certain testimony." *Commonwealth* v. *Vallejo*, 455 Mass. 72, 84 (2009), quoting *Commonwealth* v. *Williams*, 450 Mass. 645, 651 (2008).

As to the second reference, the judge misspoke in not striking Sherrod's statement that the defendant had sold drugs, where the judge plainly meant to strike it. But we are confident from our review of the record that, despite the literal meaning of the judge's words, the jury understood from its context that he was striking Sherrod's answer, which was cut off by defense counsel's objection after Sherrod had said only, "He sold drugs." Defense counsel no doubt shared this understanding, because he did not object to the judge's instruction.

Even if the jury had understood the judge to mean that this answer was not struck, the defendant's substantial rights were not affected, because we can say, "with fair assurance," in view of the overwhelming evidence of the defendant's guilt, that the jury's verdict was "not substantially swayed" by this testimony. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

There was no evidence that drugs provided a motive for the armed robbery or the shootings; the defendant told Sherrod that the robbery was done on the "spur of the moment" and for "straight money," not narcotics. Nor is there any reason to believe that the jury would have been affected by his bad character had they believed him to be a drug dealer.[9]

2. *The prosecutor's closing argument.* In defense counsel's cross-examination of Sherrod, he asked numerous questions eliciting that Sherrod was required under his plea agreement to offer "truthful testimony." He asked Sherrod what he thought would constitute a breach of the agreement, and Sherrod answered that he would be in breach if he were to commit additional crimes during the period of his cooperation or if he were to provide false information. Defense counsel asked Sherrod how "they" were going to assess whether his testimony at trial was truthful.[10] After sustaining the prosecutor's objection to the question, the judge instructed the jury that the testimony of a witness, like Sherrod, who has entered into a plea and cooperation agreement with the United States of America, must be examined "with extra care and caution," and that "[a]ny reference . . . to truthfulness in any kind of an agreement does not . . . mean that the government has any way of knowing whether or not a witness is telling the truth . . . ." After defense counsel moved to admit the plea agreement in evidence, and the agreement was admitted without objection, the judge repeated his cautionary instruction, and he repeated it a third time during his final instructions to the jury.[11]

Defense counsel in his closing argument declared:

"[T]he foundation of this case is based upon Mr. Sherrod

[9]In fact, because he told the police in his postarrest interview that he had no job and supported himself by doing "odd jobs" for his mother, but was at the Mohegan Sun Casino on the afternoon after the shootings, his defense may have been better served if the jury had inferred that he was gambling with drug money rather than with the proceeds of the previous night's robbery.

[10]Defense counsel later asked Sherrod whether it was fair to say that his "fate rests in the hands of the United States of America and their agents and what cooperation they decide that you have given." The prosecutor's objection to the question was sustained.

[11]The only redaction of the plea agreement sought by defense counsel was the removal of Sherrod's attorney's name and address from the first page of the agreement.

. . . . But what do we know about him? We know that he is paid money to deceive people. That's his job. It's been his job since after signing the agreement with the United States of America. The unfortunate part is he deceives people on our behalf. We pay him to deceive people. But he is a deceiver . . . ."

The prosecutor in closing argument stated:

"[Defense counsel] asked [Sherrod] this question: . . . 'What would constitute a violation of your agreement?' 'If I committed a crime, or if I lied.' So Willie Sherrod to get caught in a lie, he'd be facing all of those years that he told you he's trying to avoid. You don't take that kind of chance."

The defendant contends that the prosecutor's argument was improper because it suggested to the jury that the prosecutor would know if Sherrod had lied. We conclude that the argument was fair and proper.

In *Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989), we recognized that, where a cooperating witness testifies in the prosecution case in accordance with a plea agreement, "[a] prosecutor's position is a delicate one." *Id.* at 265. "The prosecutor must be free to argue that such a witness is credible, but may not explicitly or implicitly vouch to the jury that he or she knows that the witness's testimony is true." *Id.* We provided guidance as to what a prosecutor may and may not do in closing argument. "A prosecutor in closing argument may restate the government's agreement with the witness and may argue reasonable inferences from the plea agreement's requirement of truthful testimony." *Id.* A prosecutor may not express "a personal belief in the credibility of a witness" or suggest that the prosecutor "has knowledge independent of the evidence before the jury verifying a witness's credibility." *Id.*, and cases cited.

The prosecutor here did what he is permitted to do, and did not venture into the forbidden realm of vouching. It was defense counsel who first placed Sherrod's credibility in question through cross-examination and closing argument. Defense counsel suggested that Sherrod's testimony was not worthy of belief, because Sherrod had a strong incentive falsely to implicate the defendant

in the murders in order to provide the substantial assistance to the prosecution that would earn him a more lenient sentence. Defense counsel suggested that Sherrod need not fear being found in violation of his agreement as long as he told the story the government wanted him to tell. The prosecutor, relying on the plea agreement the defendant had introduced in evidence and Sherrod's answers to questions asked by defense counsel, was entitled to argue a different inference. See *Commonwealth v. Sanders*, 451 Mass. 290, 297 (2008) (where defense counsel places witness's credibility at issue in cross-examination and closing argument, "prosecutor was entitled to respond within the limits of the evidence and to provide the jury with reasons for believing [the witness]"). The prosecutor reasonably and properly argued that the witness would not risk lying under oath, because the consequences of a breach of the agreement were too great. He did not suggest that he knew that Sherrod spoke the truth or that he possessed information not presented to the jury that would enable him to know if Sherrod were lying. Contrast *Commonwealth v. Meuse*, 38 Mass. App. Ct. 772, 774 (1995), *S.C.*, 423 Mass. 831 (1996) (prosecutor's closing argument improper where he declared, "if [the witness] is not telling the truth, we have an army of police that can go out and corroborate every detail he is giving us").

Moreover, there was no material risk here that any juror would implicitly understand that the prosecutor knew from information outside the evidence that Sherrod was telling the truth. See *Commonwealth v. Ciampa, supra* at 266 ("plea agreement by itself could be viewed as an implied representation by the government that the witness's testimony will be truthful"). The judge three times instructed the jury to examine Sherrod's testimony with caution and care, and told them that the government had no way of knowing whether a witness was telling the truth. See *Commonwealth v. Marrero*, 436 Mass. 488, 502 (2002) ("effect of the charge was to dispel any implication inherent in the agreement that the prosecutor warranted that the [cooperating witness] was telling the truth"); *Commonwealth v. Ciampa, supra.*

3. *Removal of spectators from the court room.* After the verdicts had been recorded, when the judge asked defense counsel if he wished to be heard as to sentencing, defense counsel declared that he had nothing to say as to sentencing, "But I'd like to be

heard on an ancillary matter after sentencing." After the sentences were pronounced, defense counsel said that certain members of the defendant's family and other spectators who came in support of the defendant had been removed from the court room.[12] He said they had created "neither a disturbance nor any problem," and that he wished to "make a complaint" because he believed they were excluded without cause.

The judge said that it had come to his attention that, over the last two days, one of the court officers was seriously threatened with bodily harm, and that the one or two individuals "allegedly involved in that threat were the individuals who were asked to leave the court room." He added, "I agree with you that security is of paramount importance, and it is [in] that context that the court exercised its discretion to make sure the proper decorum was followed for the lives of the court officers, lives of the public, safety of court officers, and safety of people in the court room and the exterior of the court room." The defendant claims that the removal of the spectators was structural error that requires a new trial.

Where a court room is closed to some, but not all, spectators, during jury selection, there is "a partial rather than a full or complete closure of the court room." *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 110 (2010) (*Cohen*). To justify a partial closure in view of the right to a public trial under the Sixth Amendment to the United States Constitution, a judge must make "a case-specific determination that closure is necessary." *Cohen, supra* at 107. The determination must satisfy four requirements: (1) that there is a substantial reason to justify the closure; (2) that the closure is no broader than necessary to protect the interest likely to be prejudiced; (3) that the judge considered reasonable alternatives to closure; and (4) that findings were issued adequate to support the closure. *Id.* at 107, 111-115, citing *Waller* v. *Georgia*, 467 U.S. 39, 48 (1984).[13]

---

[12]Defense counsel did not say when the spectators had been removed from the court room; nor does the record shed light as to when it occurred. Defense counsel said that he had asked the clerk to be seen at sidebar before the verdicts were read, which suggests that it had happened before then, but the defendant on appeal claims that he was denied his right to a public trial at sentencing. In view of our legal conclusion, we need not remand the case to resolve this factual confusion.

[13]We address here the defendant's claim of a violation of his right to a

The United States Supreme Court has recognized that "[t]here are no doubt circumstances where a judge could conclude that . . . safety concerns are concrete enough" to warrant closure of the court room. *Presley* v. *Georgia*, 130 S. Ct. 721, 725 (2010).[14] See *Gannett Co.* v. *DePasquale*, 443 U.S. 368, 388-389 n.19 (1979) ("trial judges have been given broad discretion to exclude spectators to protect order in their courtrooms"). We have also recognized the inherent authority of a judge to maintain safety, order, and decorum in the court room. See *Commonwealth* v. *Hobbs*, 385 Mass. 863, 868 (1982), and cases cited ("Judges may exclude spectators from the courtroom when necessary to . . . maintain order"); *Commonwealth* v. *Bohmer*, 374 Mass. 368, 380-381 (1978), and cases cited ("judge has the authority to exclude spectators . . . who conduct themselves in a manner that disrupts the order and decorum of the proceedings").

Addressing each of the four requirements, the first three are clear. The judge's finding that the spectators removed from the court room had threatened a court officer with bodily harm provided substantial cause to remove them. Because only the spectators who made threats were removed, the partial closure was no broader than necessary to protect the interest of court safety and security. While the record does not suggest that the judge considered reasonable alternatives to partial closure, there was no apparent reasonable alternative other than to remove the person or persons who had made the threats from the court room.[15]

public trial under the Sixth Amendment to the United States Constitution, not a claim brought under the First Amendment to the United States Constitution by any person barred or removed from the court room.

[14]The Supreme Court in *Presley* v. *Georgia*, 130 S. Ct. 721, 725 (2010), considered a total closure of a court room during voir dire; the statement is no less true in considering a partial closure at another phase of the trial. See *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 112-113 n.28 (2010).

[15]In *Cosentino* v. *Kelly*, 102 F.3d 71, 73 (2d Cir. 1996), cert. denied, 520 U.S. 1229 (1997), the United States Court of Appeals for the Second Circuit suggested that the four requirements need be considered only where the court room is closed to "peaceable individuals." We conclude that the requirements apply to any partial closure of a court room, but will give substantial deference to a judge's determination that the removal of a violent or disruptive spectator from the court room satisfies these requirements. We also recognize that, where a judge is addressing an immediate threat to the safety or decorum of the court room, the required findings may need to be delayed until order is restored, the court room secured, and the judge has an adequate opportunity to gather the relevant facts. Cf. *Huminski* v. *Corsones*, 386 F.3d 116, 150 (2d

As to the fourth requirement, we conclude that, in the circumstances, the judge's findings were adequate to support the partial closure. While these findings were not as comprehensive or as precise as we would have liked,[16] they were adequate here, where they make clear that a court officer had been threatened by the spectator or spectators who were removed from the court room, where the matter was not raised until after the defendant had been sentenced, and where only one or two individuals were removed from the court room.

Because the removal of the one or two spectators from the court room satisfied the four requirements of a partial closure, we conclude that the defendant's right to a public trial was not violated.[17] In the future, however, where a judge orders or approves the removal of a spectator from the court room in a criminal case, the judge, if practicable, should bring counsel promptly to sidebar, inform them of what happened, make findings of fact adequate to support the spectator's removal, and provide counsel with an opportunity to object and be heard. See *Presley* v. *Georgia, supra* (where safety concerns are concrete enough to close court room during jury selection, judge should make findings articulating particular interest and threat to that interest with specificity sufficient to allow reviewing court to determine whether closure order was properly entered); *United States* v. *Sherlock*, 962 F.2d 1349, 1358 (9th Cir.), cert. denied sub nom. *Charley* v. *United States*, 506 U.S. 958 (1992) (with partial closure, defendant should be given opportunity to be heard and judge must make factual findings).

Cir. 2004) (requirement that specific findings be articulated "may be dispensed with when the imminence of the threat or other circumstances do not reasonably permit it").

[16]For instance, the judge did not identify the source of the information on which he relied to make his findings; we infer from the circumstances that the information was provided by court officers with personal knowledge of the threats. In addition, although we infer that he found that the individuals removed from the court room actually participated in making the threats, he described them as "those individuals that were allegedly involved in that threat."

[17]In view of our conclusion, we need not address whether the defendant waived his right to a public trial by not complaining on the record about the removal of the spectators from the court room until the sentencing had concluded. Nor need we address whether the remedy of a new trial for the structural error of denying a defendant his right to a public trial applies where a partial closure of the court room occurs only at sentencing.

4. *The denial of additional time to prepare for closing argument.* At the close of the third day of trial, the prosecutor informed the judge and defense counsel that he expected to rest the next day. Defense counsel said that, if the prosecution were to conclude the next afternoon, he could probably be prepared for closing argument, but asked if the judge intended to send the case to the jury on the fifth day (a Friday), where the judge had already informed the jury that they would adjourn that day at 1 P.M. The judge said that he was inclined to give the case to the jury on Monday, and did not expect they would do the closing arguments on Thursday afternoon, but the prosecutor said they should proceed to closing arguments on Thursday afternoon if he rested before the lunch break.

At trial the next morning, the prosecutor informed the judge and defense counsel that the Commonwealth would be resting by noon. The judge said that he thought they could complete the charge conference and closing arguments that afternoon. The defendant made no objection. However, after the prosecution rested that morning and the judge declared they would have a short charge conference and proceed to closing arguments, the defendant objected, claiming that he was not prepared for his closing argument. The judge conducted his charge conference in the morning, adjourned for an hour, and then proceeded with closing arguments in the afternoon.[18] The defendant contends that his counsel was denied a reasonable time to prepare his closing argument and, as a result, the defendant was denied due process.

The decision whether to adjourn to allow counsel additional time to prepare a closing argument, like the decision whether to grant a continuance, rests in the sound discretion of the judge. See *Commonwealth* v. *Cruz*, 456 Mass. 741, 747 (2010). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar* v. *Sarafite*, 376 U.S. 575, 589 (1964). "[A] judge may not exercise her discretion in such a way that denial of the continuance deprives the defendant of the right to effective

---

[18]The defendant renewed his objection to proceeding with the closing arguments after the lunch break.

assistance of counsel and to due process of law." *Commonwealth v. Cruz, supra.*

In determining whether the judge abused his discretion in denying a continuance, we focus on "what constitutes a reasonable period of time for preparation, not on defense counsel's subjective satisfaction with his level of preparedness." *United States v. Rodriguez-Duran,* 507 F.3d 749, 765 (1st Cir. 2007), quoting *United States v. Moore,* 362 F.3d 129, 135 n.7 (1st Cir. 2004). Even if we were to conclude that a judge erred in denying defense counsel additional time to prepare his closing argument, "[a] defendant is generally not entitled to a new trial unless he or she can identify specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense." *United States v. Rodriquez-Duran, supra,* quoting *United States v. Rodriguez-Marrero,* 390 F.3d 1, 22 (1st Cir. 2004).

The judge did not abuse his discretion by denying defense counsel additional time to prepare his closing argument. The prosecutor informed defense counsel on Wednesday afternoon that he would rest the next day, which gave fair warning that the closing arguments might take place on Thursday afternoon, even though the judge said he did not expect that would happen. In addition, defense counsel had the lunch break of one hour on Thursday to prepare and polish his closing. Finally, the defendant does not identify any argument that defense counsel failed to make in his closing argument that, if he had more time, he would have made and that possibly could have affected the jury's verdicts.

5. *The defendant's claims in his pro se brief.* We need not dwell long on the three arguments the defendant made in his pro se brief, because all are frivolous. First, the defendant claims that the judge erred in admitting in evidence the tape-recorded telephone conversations between the defendant and Sherrod, because Sherrod was acting as an agent of the government and the defendant was not represented by counsel. The judge did not err. The defendant was not in custody when he spoke by telephone to Sherrod, so he had no constitutional right to Miranda warnings or to counsel under the Fifth Amendment to the United States Constitution or art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth v. Groome,* 435 Mass. 201, 215-216 (2001).

Nor had formal adversary proceedings commenced against him, so his right to counsel under the Sixth Amendment or art. 12 had yet to attach. *Id.* at 215.[19]

Second, the defendant claims that the judge erred in instructing the jury that they could find him guilty under a joint venture theory based on a preponderance of the evidence rather than by proof beyond a reasonable doubt. The judge gave no such instruction; the defendant conflates the judge's instruction regarding their consideration of a statement by a joint venturer with his instruction regarding a finding of guilt as a joint venturer. The judge instructed the jury that they may consider the statement, "I'm not going to leave here before I shoot someone,"[20] only if they made the preliminary determination by a fair preponderance of the evidence, based on evidence independent of the statement, that the statement was made by a joint venturer. The judge erred in this instruction only by failing to add that, to be considered, the statement must have been made during the course of the joint venture and in furtherance of the joint venture. See *Commonwealth* v. *Braley*, 449 Mass. 316, 319-320 (2007), and cases cited; Mass. G. Evid. § 801(d)(2)(E), at 231 (2011). But there was no objection to this aspect of his instruction and no risk of a miscarriage of justice arising from it. The judge provided the jury with a different and correct standard of proof for a guilty verdict, stating that the Commonwealth must "prove[] to you beyond a reasonable doubt that the defendant acted either as a principal or a joint venturer."

Finally, the defendant argues that the felony underlying the charge of felony-murder — masked armed robbery, in violation of G. L. c. 265, § 17 — is not punishable by life imprisonment and that the judge therefore erred in instructing the jury on felony-murder in the first degree. The defendant is in error. Masked armed robbery, like armed robbery, in violation of G. L. c. 265, § 17, is punishable by life imprisonment; the only difference between the two crimes is that there is a mandatory

---

[19]Although the defendant does not raise the issue, we note that the tape recording was made with Sherrod's consent and under the direction of Federal law enforcement officers, and therefore did not require a judicial warrant authorizing electronic surveillance. See G. L. c. 272, § 99 D 1 c.

[20]The judge paraphrased the testimony of Raymond Lucia, who testified that he heard the words, "I'm not leaving here without shooting somebody."

minimum sentence for masked armed robbery but not for armed robbery. The defendant confuses the minimum mandatory sentence with the maximum sentence.

6. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and find no error that produced a substantial likelihood of a miscarriage of justice, nor any other reason to order a new trial or to reduce the defendant's murder convictions to a lesser degree of guilt.[21]

*Judgments affirmed.*

---

[21]Because the defendant was convicted of murder in the first degree on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, the judge did not err in sentencing the defendant on the masked armed robbery convictions, even though they were the lesser included offenses of the felony murder. In essence, the judge sentenced the defendant to life without the possibility of parole on the first two theories, not on the felony-murder theory, so the sentences were not duplicative. See *Commonwealth* v. *Pagan*, 440 Mass. 84, 93 (2003); *Commonwealth* v. *Jackson*, 428 Mass. 455, 467 (1998).