NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11671


COMMONWEALTH  vs.  MARQUISE BROWN.



Middlesex.      February 12, 2016. - June 17, 2016.

Present: Gants, C.J., Spina, Botsford, Duffly, & Lenk, JJ.


Homicide.  Firearms.  Constitutional Law, Admissions and
     confessions, Voluntariness of statement, Waiver of
     constitutional rights, Confrontation of witnesses.
     Evidence, Admissions and confessions, Voluntariness of
     statement, Hearsay, Common criminal enterprise, Joint
     enterprise, Telephone conversation, Relevancy and
     materiality.  Joint Enterprise.  Telephone.  Imprisonment,
     Inmate telephone calls.  Practice, Criminal, Capital case,
     Motion to suppress, Admissions and confessions,
     Voluntariness of statement, Waiver, Confrontation of
     witnesses, Instructions to jury, Request for jury
     instructions.




     Indictments found and returned in the Superior Court
Department on August 6, 2009.

     A pretrial motion to suppress evidence was heard by John T.
Lu, J., and the cases were tried before Kimberly S. Budd, J.


     Gail S. Strassfeld for the defendant.
     Jamie Michael Charles, Assistant District Attorney
(Christopher M. Tarrant, Assistant District Attorney, with him)
for the Commonwealth.

SPINA, J.   The defendant, Marquise Brown, was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.  He also was convicted of illegally carrying a firearm, illegal possession of a loaded firearm, and illegal possession of ammunition.  On appeal the defendant asserts error in (1) the denial of his motion for a required finding of not guilty as to the theory of murder by extreme atrocity or cruelty; (2) the denial of his motion to suppress his statements to police; (3) the admission in evidence of accusations by police during the interrogations of the defendant; (4) the admission of a statement of the codefendant[1] under the joint venture exception to the hearsay rule; (5) the admission of recorded jailhouse telephone calls; (6) jury instructions on the theory of extreme atrocity or cruelty; and (7) jury instructions that precluded the jury from considering the defendant's youth as to various issues.  The defendant claims that the cumulative effect of the various errors requires a new trial, pursuant to G. L. c. 278, § 33E. We affirm the convictions and decline to exercise our powers under § 33E to reduce the degree of guilt or to order a new trial.

1.  Background.  The jury could have found the following facts.  Other details are reserved for discussion of specific

---

[1] Yessling Gonzalez, the codefendant, was tried separately.

issues.  On the evening of June 19, 2009, the defendant, Yessling Gonzalez, and the victim, all friends, attended a party in an apartment complex in Marlborough.  The party ended after a neighbor complained about the noise.  One of the partygoers, Melody Downer, invited people, including the defendant and the victim, to her apartment, which was nearby.  While at Downer's apartment, the defendant placed his money and marijuana on a table.  Downer took the money, and Gus Landrum took the marijuana.  The defendant, however, believed the victim had stolen the items.  Later that night, at the apartment of another friend, the defendant accused the victim of stealing his money and his marijuana.  The two men, both age seventeen at the time, fought.  The altercation moved through the hallways of two separate floors of the building, and attracted many onlookers. The victim got the better of the defendant.  The victim then left, and the defendant's friends had to restrain the defendant to keep him from following the victim.  The defendant was angry and threatened to kill the victim, adding that he "didn't care if he spent the rest of his life in jail."

At about 1:30 P.M. the next day, June 20, the defendant and Gonzalez returned to the Marlborough apartment complex with the defendant's girl friend and some friends after going to lunch. Thereafter, the defendant, Gonzalez, and the victim traveled together in Gonzalez's silver Volvo station wagon to Callahan

State Park in Framingham.  Surveillance photographs showed the Volvo and three occupants at 1:41 P.M. heading toward the park. Two men who had been mountain biking in the park saw the Volvo enter the parking lot at the park.  They described for police the three occupants, and a distinctive feature of the Volvo. Their descriptions generally matched the features and clothing worn by the defendant, Gonzalez, and the victim.  The defendant, Gonzalez, and the victim approached the entrance to a trail as the two mountain bikers left the parking lot.  The three men appeared friendly toward each other.

At approximately that time an employee at a nearby farm heard two or three gunshots.  At 2:01 P.M. the Volvo appeared on a surveillance recording traveling away from the park with only two occupants.  Minutes later a hiker discovered the victim's body on a trail.  A bandana similar to one worn by Gonzalez was found on the trail between the victim's body and the parking lot.  The victim sustained two gunshot wounds.  The first was fired from behind, penetrating the right thigh, scrotum, and left thigh.  The second and fatal shot entered the front of the victim's chest and perforated his heart and left lung.  Gunshot residue on the victim's shirt indicated the second shot was fired from between three to five feet.  The trajectory of the second shot, together with abrasions on the victim's right knee,

suggested the victim was on his knees when the second shot was fired. The murder weapon never was recovered.

In recorded telephone calls from the jail where the defendant was being held pending trial, the defendant admitted to his grandmother that he was present during the killing, and that he knew who did it. He told his grandmother during a subsequent call that "the devil was in me . . . [and] told me to get in [Gonzalez's] car." In another telephone call the defendant told his girl friend that Gonzalez was the shooter.

2. Extreme atrocity or cruelty. The defendant asserts error in the denial of his motion for a required finding of not guilty as to the theory of murder by extreme atrocity or cruelty. In particular, he maintains that the Commonwealth failed to present evidence from which a jury could conclude that any of the Cunneen factors had been established. See Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). He focuses on the factor that the killer took pleasure in, or was indifferent to, the victim's suffering. Id. When deciding whether a judge erred in denying a motion for a required finding of not guilty, we view the evidence in the light most favorable to the Commonwealth, and we ask if any rational trier of fact could have found that the requisite elements of the crime had been proved beyond a reasonable doubt. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

Notwithstanding the defendant's contention that the medical examiner could not determine the order of the two gunshots, and her testimony that a gunshot wound to the chest could have produced death "instantaneous[ly]," the medical examiner testified that her "best estimate" was that the victim lived "minutes" after being shot in the chest. This was supported by her testimony that the gunshot wound to the chest caused approximately three liters of blood to flow into the victim's chest cavity. A jury could have inferred that death occurred minutes after the victim was shot in the chest.

With respect to the order of the gunshots, a jury could have found that the first shot passed completely through the victim's thighs and scrotum while he was standing. That bullet traveled at a slightly downward angle, or nearly parallel to the ground, which could explain why it was never found despite efforts through the use of a metal detector to locate it. The medical examiner testified that the bullet that passed through the victim's scrotum likely would have been painful. A jury also could have found that the victim then fell to his knees, bruising them, and that the defendant circled around the victim, looked him in the face, and fired the second bullet at close range into his chest.

From this evidence, and from the evidence that the defendant was angry at the victim for beating him the day

before, the evidence of the defendant's threats to kill the victim even if it meant spending the rest of his life in prison, and the permissible inference that the defendant lured the victim to the park as a symbol of their restored friendship, the jury could have found that the defendant took pleasure in, or was indifferent to, the victim's suffering. See Commonwealth v. Anderson, 445 Mass. 195, 202 (2005) (jury could have found defendant was indifferent to victim's suffering based on inference that victim was kneeling and terrified by knowledge of what was coming before defendant shot him in face). The jury also could have found that the victim was conscious of his suffering. Thus, a jury could have found that the Commonwealth had established two of the Cunneen factors (only one is needed) beyond a reasonable doubt. See Cunneen, 389 Mass. at 227. See also Commonwealth v. Linton, 456 Mass. 534, 546 (2010) (one or more Cunneen factor must be proved). There was no error in the denial of the defendant's motion for a required finding of not guilty.

3. Motion to suppress. The defendant asserts error in the denial of his motion to suppress statements he made to police on June 21 and June 23, 2009. He argues that he was in custody both times, and the Commonwealth failed to prove beyond a reasonable doubt that he validly waived his Miranda rights and that his statements were made voluntarily. When reviewing the

denial of a motion to suppress, "[w]e accept the judge's subsidiary findings absent clear error but conduct an independent review of his ultimate findings and conclusions of law." Commonwealth v. Jiminez, 438 Mass. 213, 218 (2002). The defendant's focus is on the involuntariness of the Miranda waiver and the involuntariness of his statements. The burden is on the Commonwealth to establish "beyond a reasonable doubt, in the totality of the circumstances, that a defendant's [Miranda] waiver was voluntary, knowing, and intelligent, and that his statements were voluntary." Commonwealth v. Auclair, 444 Mass. 348, 353 (2005). We summarize the facts found by the motion judge.

Early in the investigation police learned that the defendant and the victim had been involved in a fight on June 19, and that the defendant had accused the victim of stealing his marijuana and his cash. Police obtained a video surveillance recording from the New England Primate Center, located close to where the victim's body was found. The recording showed two vehicles, one, a silver Volvo, traveling to and from the vicinity of the shooting, before and after the time that the sound of gunshots had been reported to police. On June 21, two plainclothes detectives went to the apartment where the defendant was living. The defendant answered the door. He had a black eye, and explained that he received it in a fight. The

detectives asked if they could enter, and the defendant obliged. There were two other adults, including Gonzalez, and three children in the apartment. One of the detectives spoke to the defendant, who appeared to understand what the detective was saying. He did not appear to be under the influence of alcohol or drugs, and he agreed to go to the police station to speak to police. He left with two other police officers who had arrived, and he did not appear unsteady on his feet or demonstrate any difficulty walking.

One of the two detectives who originally arrived at the apartment remained. He spoke to Gonzalez, asking for some identification. Gonzalez said it was in his vehicle. When they went to Gonzalez's vehicle, police noted that it was a Volvo station wagon. He gave police some information as to his whereabouts at the time police believed the shooting took place.

In the meantime, the defendant was en route to the Framingham police station in an unmarked police vehicle. When they were a few blocks from the police station the defendant said he had to urinate very badly. As they pulled up to the "side of the road" the defendant urinated in his pants.[2] The

_____

[2] The defendant contests this finding, arguing that no officer testified to this. The judge's finding appears to be clearly erroneous, as the officer on which this finding was based testified that this happened as they were "pulling into the side road that leads to the . . . side entrance [of the police station]" (emphases added). However, the import of the

motion judge found that "[h]e urinated in his pants because he had to urinate very badly, and because he was very upset, although not visibly so, about being questioned about the killing of [the victim]." Once at the station the officers brought the defendant to a bathroom, where he cleaned himself.

At approximately 5 P.M. the defendant was brought to an interview room where he was advised of his right to have the interview tape recorded. He declined in writing to have the interview recorded. He was advised of the Miranda rights, and he was told that he could stop the interview at any time. The defendant, who had prior experience with the criminal justice system -- having been previously arrested and prosecuted as a juvenile -- indicated he understood his rights and that he was willing to be interviewed.

The interview lasted approximately one hour. The defendant was "outwardly affable and cooperative although in emotional turmoil: he was appropriately upset about being questioned about the killing." The two police officers who interviewed him were not armed, having locked up their weapons earlier. The defendant took three bathroom breaks and one cigarette break during the interview. He denied being present when the victim

judge's finding appears to be unaffected by this minor error. The uncontroverted testimony suggests that this occurred when they were very close to the police station, where the officers thought he could use the bathroom.

was shot.  He consented to the taking of a buccal swab for deoxyribonucleic acid analysis.  At the end of the interview he was driven home, which took approximately fifteen minutes.

The next day, June 22, two mountain bikers came forward with information regarding three men in a Volvo station wagon who entered the park as the bikers were leaving.  This occurred minutes before the shooting.  One of the bikers described a strip of body work on the front of the Volvo that did not match the rest of the vehicle.  A detective drove the men to the parking lot where Gonzalez's Volvo was parked.  That biker identified the Volvo as the same one he saw on June 20 at Callahan State Park.

On June 23 three officers went to the defendant's apartment to ask him to go to the police station for questioning.  The defendant had been sleeping, but answered the door.  He agreed to go to the police station with them.  They "allowed" the defendant to change his clothes.  The defendant appeared cooperative and "more awake."

Upon arrival at the station, he was taken to a small interview room where he was advised of his Miranda rights, and he was told that he could stop the questioning at any time.  The defendant said he understood his rights, and signed a waiver of rights form.  He also indicated that he did not want the interview recorded.  Police spoke to him for about fifteen

minutes, and told him there were contradictions between his account and what other witnesses had reported. The defendant yelled at police, saying he was "done talking to you guys." The interview ended, and a decision was made to arrest the defendant. He asked why he had been arrested. When told that it was for "murder," he said, "This is bullshit. How can you charge me with murder, you don't even have a gun?" This occurred between approximately 6:45 and 7 P.M.

We first address the question of waiver. The defendant claims that the interrogations on June 21 and June 23 were custodial, and that he did not waive his Miranda rights voluntarily. The judge concluded that neither interrogation was custodial. We need not resolve the question whether the interrogations were custodial because the judge also found that the defendant waived his Miranda rights on both occasions. The significance of the custodial nature of an interrogation is that it triggers the necessity to give the Miranda warnings. See Commonwealth v. Kirwan, 448 Mass. 304, 309 (2007). Here, the warnings were given prior to questioning, and the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. The defendant challenges only the voluntariness of his waivers, which we now address.

Relevant factors to consider when deciding if a waiver of Miranda rights was voluntary include, but are not limited to,

"promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or police), and the details of the interrogation, including the recitation of Miranda warnings."  Commonwealth v. Jackson, 432 Mass. 82, 86 (2000), quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986), S.C., 403 Mass. 93 (1988).  With respect to the June 21 interrogation, the defendant focuses our attention on his age (seventeen), the officers' alleged mistreatment of him in refusing to stop the vehicle to allow him to urinate, and not asking him if he would like to change his clothes.

The judge considered the defendant's youth, the fact that he was upset about being questioned about the killing, and that he had urinated in the vehicle.  He also considered the fact that the defendant did not appear to be under the influence of alcohol or drugs, that he consented to going to the police station to be interviewed, that he had had some experience with the criminal justice system as a result of a prior arrest and prosecution in the Juvenile Court, that he was advised prior to questioning that he could stop the questioning at any time, that he appeared affable and cooperative at all relevant times, that the police officers were unarmed during the interrogation, that

he requested and received three bathroom breaks and a cigarette break, that the interview lasted approximately one hour, that the defendant denied any involvement in the killing, and that the defendant said he understood his rights and agreed to speak with police.  Although the defendant argues that the police mistreated him by not stopping the vehicle to allow him to urinate, the judge did not find there was mistreatment.[3]  Rather, the episode could be seen as an honest misunderstanding as to how badly the defendant needed to relieve himself -- particularly where the defendant urinated in the police officers' vehicle.[4]

With respect to the June 23 interview, the defendant focuses our attention on alleged testimony that he tried to consult with his mother beforehand and that his mother wanted to be with him.[5]  Because the defendant was seventeen years old at

---

[3] There was testimony that they were less than two blocks away from the police station when the defendant first said he had to urinate "really bad."

[4] There was uncontroverted testimony that the defendant did not complain of any discomfort at any time during the interrogation.

[5] The record indicates that police drove the defendant and his mother to the police station at the request of the defendant or his mother.  It is not clear who made the request.  Police told the defendant and his mother that they wanted to interview the defendant alone.  There was no further discussion on the matter.

the time, the "interested adult rule" was not applicable.[6]  See
Commonwealth v. Considine, 448 Mass. 295, 297 n.7 (2007), and
cases cited.  The defendant was advised of his Miranda rights.
He acknowledged that he understood them, and he signed a written
waiver after indicating his willingness to speak to police.  The
judge correctly concluded that, in the totality of the
circumstances, the defendant voluntarily waived his Miranda
rights.

We turn to the question of the voluntariness of the
defendant's statements.  The factors considered when determining
whether a statement was voluntary are the same as those used to
determine whether a waiver of Miranda rights was voluntary, even
though the inquiries are separate and distinct.  See Jackson,
432 Mass. at 85-86.  No single factor is determinative, and a
statement will not be deemed involuntary due to the mere
presence of one or more of the factors.  See Commonwealth v.
Selby, 420 Mass. 656, 664 (1995), S.C., 426 Mass. 168 (1997).
The defendant received, understood, and waived his Miranda
rights on June 21 and June 23 prior to making any statement.
There is no evidence that the police had taken an aggressive
posture during the interrogation on June 21, or that they

---

[6] The "interested adult rule" arose in the common law.  See
Commonwealth v. A Juvenile, 389 Mass. 128, 134 (1983).  We
recently have modified the rule, on a prospective basis, to
include seventeen year old persons.  See Commonwealth v. Smith,
471 Mass. 161, 166-167 (2015).

engaged in any trickery or deceit, or that they offered the defendant any promise of leniency.  See id.  The interview lasted approximately one hour, interspersed with three bathroom breaks and a cigarette break -- not a particularly lengthy interrogation.  There is no evidence that the defendant's will was overborne by the questioning.  Id. at 663.  Moreover, the defendant held up under the circumstances, denying any involvement in the killing.  See Commonwealth v. Mazariego, 474 Mass. 42, 54 (2016).  We conclude that there was no error in the determination that the June 21 statement was voluntary.

The June 23 interrogation was somewhat different.  Police had interviewed several witnesses between June 21 and June 23.  At this second interrogation they told the defendant that details in his June 21 statement were inconsistent with details given by other witnesses, and that they had reason to believe that he had not been truthful with them about where he had been and what had occurred on June 20.  The uncontroverted evidence suggests that it was the defendant, and not the officers, who assumed an aggressive tone.  He raised his voice and repeatedly demanded to see the gun, and to know who had contradicted his account of events.  After fifteen minutes, the defendant terminated the interview.  There is no indication that any statement he made was involuntary.

Finally, after his arrest the defendant said the murder charge was "bullshit" because police did not "have a gun."  This statement was not made in response to police questioning or its functional equivalent, see Commonwealth v. Torres, 424 Mass. 792, 796-797 (1997), but was a spontaneous statement that did not require suppression.  See Commonwealth v. Clark, 432 Mass. 1, 15-16 (2000).  There was no error in the denial of the defendant's motion to suppress evidence.

4.  Admission of accusations that defendant lied.  The defendant argues that accusations by police officers during the interrogation of June 23 that he had lied during the interrogation of June 21 should not have been admitted where he denied those accusations.  Where he denied those allegations, he further contends that officers testified impermissibly about information they obtained from witnesses and used during the interrogation of June 23 to bolster their accusations that he had lied previously on June 21, and such testimony violated his constitutional rights of confrontation.  The defendant is correct.  See Commonwealth v. Amran, 471 Mass. 354, 360-361 (2015), and cases cited.  Because there was no objection, we review under the standard of a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

The "information" police obtained from people they interviewed in the course of their investigation was not repeated either during the June 23 interrogation or at trial. Police merely told the defendant that based on the results of their investigation they knew he had been at Callahan State Park with Gonzalez on June 20, 2009. They confronted him with their belief, not with the details of what specific people had told them, or who those people where, and that is what the jury heard. At worst, the conclusory assertion that the defendant and Gonzalez were together at the park at the time of the shooting was cumulative of other testimony that was admitted properly. That other testimony includes the testimony about the defendant's expressed intent on June 19 to kill the victim; the testimony of the mountain bikers who roughly described the three men and the Volvo at the park shortly before the killing; the surveillance photographs showing the Volvo and three occupants approaching the park and minutes later showing the Volvo and two occupants leaving the park; the recorded telephone calls from the jail in which the defendant admitted to his grandmother that he was present during the killing, and in which he told his girl friend that Gonzalez was the shooter; and the statements to police that implied he knew they did not have the gun used to kill the victim. The jury also heard evidence about the alibi he had first given police during the June 21 interview. The

impact of this graphic direct evidence of the defendant's admissions and his actions far outweigh any prejudice in the testimony of the police officers.  The rather bland testimony in question was brief, and we are satisfied that it did not likely influence the jury's verdict.  See Wright, 411 Mass. at 682.

5.  Statement of Gonzalez.  Gonzalez did not testify, but a statement he made to police was admitted in evidence, over objection, under the joint venture exception to the hearsay rule.  In that statement Gonzalez said that he, the defendant, their girl friends, and the mother of one of the girl friends went to lunch on June 20.  After lunch, Gonzalez said he went to work, where he stayed until 9 P.M.  In the defendant's statement, he also said that they went to the restaurant and that Gonzalez drove them back to the defendant's girl friend's apartment, where he remained for the rest of the day.  The defendant argues that Gonzalez's statement falls outside the joint venture exception to the hearsay rule, and that it was a testimonial statement barred by the right of confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  See Crawford v. Washington, 541 U.S. 36, 53-54 (2004); Commonwealth v. Gonzalez, 445 Mass. 1, 9 (2005), cert. denied, 548 U.S. 926 (2006).

We agree that Gonzalez's statement was not admissible under the joint venture exception to the hearsay rule.  The cases that

affirm the admission of joint venture hearsay statements after the commission of the crime generally rest on direct or circumstantial evidence that the coventurers had planned to conceal the crime or their involvement in the crime.  One example of this involves an inference that may arise from the telling of similar false stories.  See, e.g., Commonwealth v. Pytou Heang, 458 Mass. 827, 854 (2011); Commonwealth v. Brum, 438 Mass. 103, 116 (2002); Commonwealth v. Silanskas, 433 Mass. 678, 680, 693 (2001).  Here, Gonzalez's account of his doings between 12:30 and 2 P.M. on June 20 and the defendant's account of his doings during the same time period were not similar, and in the absence of some evidence that they specifically concocted stories of the parting of their ways during that period of time to conceal their involvement in the crime, there was no basis for a jury to conclude that their respective alibis were conceived "in furtherance of" the goal of the joint venture. Silanskas, supra at 693.  See Mass. G. Evid. § 801(d)(2)(E) (2016).

The Commonwealth contends that there is an alternative theory for the admissibility of Gonzalez's statement.  It argues persuasively that Gonzalez's statement was not hearsay because it was not offered for the truth of the matter asserted, but as a "foundation for later showing, through other admissible evidence, that [it was] false."  Anderson v. United States, 417

U.S. 211, 219-220 (1974). See Pytou Heang, 458 Mass. at 855; Mass. G. Evid. § 801(c) (2016). Both Gonzalez's and the defendant's statements about how they parted ways during the early afternoon of June 20 could be seen as false in light of the testimony of the mountain bikers, the video recording of Gonzalez's Volvo entering and leaving the park at about the time of the shooting, and the defendant's jailhouse telephone recordings. Although Gonzalez's statement was "testimonial" under Crawford, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9. See Pytou Heang, supra at 854-855.

To the extent that the defendant asserts error in the admission of Gonzalez's statement as nonhearsay without a limiting instruction that it could not be used to establish the truth of the matter asserted, the claim is without merit. Trial counsel declined any such instruction, preferring to leave the matter for closing argument. The matter is deemed waived. There is no resulting substantial likelihood of a miscarriage of justice because both counsel brought out in closing that Gonzalez had lied, or was a liar. We conclude that the judge did not err in admitting Gonzalez's statement.

6. Jailhouse telephone calls. The defendant argues that the judge failed to evaluate the balance between relevancy and

prejudice when admitting two of six jailhouse telephone calls in evidence. The defendant objected to the evidence. We review under the prejudicial error standard. See Commonwealth v. Rosa, 468 Mass. 231, 239 (2014). Whether the probative value of evidence outweighs, or is outweighed by, its potential for prejudice is a matter committed to the discretion of the trial judge. Id. at 242.

The first call occurred on June 26, three days after the defendant's arrest, and was between the defendant and his father. The defendant can be heard considering his girl friend as an alibi witness. The defendant contends that a jury could be confused by the interplay between this call and the judge's final instructions placing the burden of proof on the Commonwealth. Specifically, the defendant suggests the jury might have believed that he had a burden to present witnesses but failed when his girl friend did not testify. The other call about which the defendant complains, the sixth telephone call in the series, was between him and his grandmother. He contends the call was too ambiguous to have any probative value, where he said the "devil was in me, for a little while . . . . I think the devil told me to get in the car."

Although juror confusion is a factor to be considered in weighing the potential prejudice of proffered evidence, see Spencer, 465 Mass. 32, 53 (2013), here, the probative value of

the evidence in this case, in the context of other evidence, strongly suggested that the defendant had given police a false alibi and enlisted his girl friend to support his effort.  This was highly relevant evidence of consciousness of guilt that far outweighed any potential prejudice.  See Commonwealth v. Mejia, 88 Mass. App. Ct. 227, 237 (2015); Commonwealth v. Mitchell, 20 Mass. App. Ct. 902, 902 (1985).

The defendant's musing in the sixth call about being possessed by the devil was highly probative of the issue of his knowledge, both before and during the shooting, that he was participating in a criminal act.  This also was relevant as rebuttal evidence to his claim at trial that, although he was present during the commission of the crime, he did not go to the park with any criminal intent and did not participate knowingly in a joint criminal venture with Gonzalez.

With respect to the defendant's claim that the judge failed to weigh the probative value against the potential prejudice of this evidence, the record belies the claim.  The judge discussed the matter with counsel and redacted certain portions of the six telephone calls to eliminate juror confusion or prejudice. Trial counsel acknowledged that the judge's efforts had met his concerns.  We are satisfied that the judge properly exercised her discretion in this regard, and that admission of the telephone calls was not error.  See Rosa, 468 Mass. at 242.

7. <u>Jury instructions</u>. The defendant asserts error in two jury instructions. The first is the judge's declining to instruct the jury that they could consider the defendant's youth on the elements of intent, knowledge, and extreme atrocity or cruelty, and on the issue of voluntariness of his statements. The defendant had requested an instruction that would have told the jury that "there was evidence that [the defendant] was a juvenile and therefore had less or a diminished capacity than an adult for making critical judgments." The requested instruction directed the jury to find and apply diminished capacity to their determination of the question of the Commonwealth's burden of proving knowledge, intent, and the <u>Cunneen</u> factors insofar as they are elements of the crime of murder. See <u>Cunneen</u>, 389 Mass. at 227.

Whether a defendant, because of youth, was incapable of forming the requisite intent, or possessing the requisite knowledge, or committing murder with extreme atrocity or cruelty, is a question of fact. In <u>Commonwealth</u> v. <u>Okoro</u>, 471 Mass. 51, 65-66 (2015), we said that the trial judge correctly excluded evidence that it was impossible for a juvenile to formulate the requisite intent to commit murder. Here, the defendant's requested instruction would have gone even further than what the defendant in <u>Okoro</u> was not allowed to do. The proposed instruction in this case essentially directed the jury

to accept, as a matter of law, that all juveniles lack the capacity to form the requisite criminal intent to commit murder. The defendant's requested instruction was not a correct statement of law, and it was properly rejected.[7]

In Okoro, 471 Mass. at 66, we affirmed the trial judge's ruling that permitted the juvenile defendant to present expert testimony "regarding the development of adolescent brains and how this could inform an understanding of this particular juvenile's capacity for impulse control and reasoned decision-making on the night of the victim's death" (emphasis added). Here, there was no comparable factual development of the record, by expert testimony or other evidence of mental impairment specific to the defendant at the time of the killing, and there was no evidence regarding adolescent brain development.  Compare Commonwealth v. Fitzmeyer, 414 Mass. 540, 549 (1993) (absent evidence that defendant's medical problems resulted in condition that diminished his knowledge of what he was doing or impaired his ability to control his actions, defendant not entitled to instruction that evidence of his mental impairment at time of

---

[7] The defendant's attempt to apply the United States Supreme Court's holding in Miller v. Alabama, 132 S. Ct. 2455 (2012), is unavailing.  The Court's focus was on the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution as it applied to sentencing and punishment of juveniles.  The Supreme Court did not discuss case law or statutory law addressing intent, knowledge, or deliberate premeditation as elements of a crime.  Id. at 2464.

crime should be considered in determining his culpability for murder in first degree). Because there was no evidence as to the defendant's circumstances with respect to neurological issues and brain development, he was not entitled to the type of instruction that we approved in Okoro.

There is no merit to the defendant's argument that the judge prevented the jury from considering his youth on the issue of the voluntariness of his statements. The judge gave a humane practice instruction in which he told the jury that the voluntariness of any statement made by the defendant must be determined from the "totality of the circumstances." This was a correct statement of the law. See Commonwealth v. Cruz, 373 Mass. 676, 688-689 (1977). Moreover, trial counsel repeatedly emphasized the defendant's youth during closing argument, focusing on his being only seventeen years of age no fewer than six times. There was no error.

There also was no error in the judge's instruction that "police are under no legal obligation to give people seventeen years or older an opportunity to have a parent accompany him or her in a police interview." This was a correct statement of the law at the time of trial.[8] See Commonwealth v. Smith, 471 Mass.

---

[8] The Legislature changed the age until which a person will be treated as a juvenile from seventeen to eighteen, by enacting St. 2013, c. 84, §§ 7-27, which amended various sections of G. L. c. 119 (proceedings against delinquent children),

161, 165-167 (2015). The instruction did not preclude the jury from considering the defendant's age when determining whether his statements were made voluntarily. As noted above, trial counsel argued the point forcefully in his closing argument.

The second assignment of error in the jury instructions concerns the instruction on the theory of extreme atrocity or cruelty. The defendant faults the judge for declining to instruct the jury that they must be unanimous as to at least one of the Cunneen factors in order to find the defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty. See Cunneen, 389 Mass. at 227. We expressly have rejected the necessity of such an instruction, see Commonwealth v. Morganti, 455 Mass. 388, 407 (2009), S.C., 467 Mass. 96 (2014), and the defendant has offered nothing that persuades us otherwise. The judge instructed the jury conformably with the Model Jury Instructions on Homicide (1999), which were applicable at that time.

There is no merit to the defendant's assertion that the trial judge erred by failing to instruct the jury that the Commonwealth must prove that the defendant intended his actions to be extremely atrocious or cruel. The defendant did not request such an instruction, so our review is limited to a

effective September 18, 2013. The defendant made his statements in June, 2009. The statutory amendment did not apply to him. See Commonwealth v. Smith, 471 Mass. 161, 165-167 (2015).

determination whether any error created a substantial likelihood of a miscarriage of justice.  See Wright, 411 Mass. at 682.  We have never said that a defendant must be shown to have had such an intent.  See Commonwealth v. Akara, 465 Mass. 245, 260 (2013); Commonwealth v. Szlachta, 463 Mass. 37, 47 (2012), citing Cunneen, 389 Mass. at 227.  In any event, we need not decide the question, as the defendant also was convicted of murder in the first degree on the theory of deliberate premeditation.

8.  Review under G. L. c. 278, § 33E.[9]  We have reviewed the briefs and the entire record and discern no reason to reduce the degree of guilt or grant a new trial pursuant to our powers under G. L. c. 278, § 33E.

Judgments affirmed.

---

[9] The parties did not brief the question, which we leave for another day, whether a juvenile convicted of murder in the first degree is entitled to plenary review under G. L. c. 278, § 33E, and is subject to the gatekeeper provision of that statute; or whether such a defendant is not entitled to plenary review but is entitled to a right of appeal from the denial of all motions for a new trial.  Cf. Commonwealth v. Angiulo, 415 Mass. 502, 507-510 (1993) (unique severity of mandatory life sentence without possibility of parole for conviction of accessory to murder in first degree justifies treatment under § 33E even if crime is not capital offense).