NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-09264


COMMONWEALTH  vs.  ANTONIO FERNANDEZ.



Norfolk.       January 9, 2018. - August 24, 2018.

Present:  Gants, C.J., Lowy, Cypher, & Kafker, JJ.


Homicide.  Firearms.  Practice, Criminal, Continuance, Fair
    trial, Sentence, Capital case.  Constitutional Law, Fair
    trial, Sentence.  Due Process of Law, Fair trial, Sentence.
    Fair Trial.



Indictments found and returned in the Superior Court
Department on August 6, 2002.

The cases were tried before Isaac Borenstein, J., and a
motion for a new trial, filed on May 29, 2015, was heard by
Beverly J. Cannone, J.


John H. Cunha, Jr., for the defendant.
Pamela L. Alford, Assistant District Attorney, for the
Commonwealth.


LOWY, J.  Almost as quickly as a verbal spat between two

groups of teenagers erupted, it dissipated.  The defendant,

Antonio Fernandez, and his friends turned their backs and began

riding their bicycles away.  Unprovoked, the defendant got off

his bicycle, turned to one of his friends, and said, "Fuck that shit." He then took out a handgun, cocked it, and walked back toward the victim. The defendant aimed the handgun at the victim and shot him in the chest. The victim collapsed nearby and died a short time later.

At trial, it was uncontroverted that the defendant killed the victim; the defendant presented a theory of self-defense. A Superior Court jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation and possession of a firearm without a license. The defendant does not challenge that he shot and killed the victim. He does, however, argue that (1) the judge abused his discretion by denying the defendant's motions for funds for an expert and for a continuance on the eve of trial, (2) the circumstances of the killing and the fact that he was sixteen at the time of the killing require a reduction of the verdict, and (3) the defendant's right to a public trial under the Sixth Amendment to the United States Constitution was violated because the court room was closed during jury empanelment. We discern no reversible error and, after thorough review of the record, decline to order a new trial or to direct the entry of a verdict of a lesser degree of guilt under G. L. c. 278, § 33E. However, we remand the matter to the Superior Court for resentencing

consistent with Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 666 (2013), S.C., 471 Mass. 12 (2015).

1. Background. We recite the facts as the jury could have found them, reserving certain details for later discussion as they relate to other issues raised on appeal.

On the evening of June 20, 2002, the victim attended a cookout in Brookline to celebrate his graduation from high school. Following the cookout, the victim and several friends, all of whom were between the ages of fifteen and nineteen years old, traveled to a nearby park to "hang out." Shortly after arriving, the victim and his friends saw three male teenagers, one of whom was the defendant, approach the park on bicycles.[1] The defendant and his two friends had traveled from Boston to Brookline, supposedly "to see some girls." The defendant and his friends were all between the ages of fourteen and sixteen; the defendant was sixteen years old at the time. The defendant and his friends entered the park, approached the victim and his friends, and asked if they had any marijuana. One of the victim's friends said that they did not, and the three Boston teenagers left the park. Neither the victim nor any of his friends knew or recognized the defendant or either of his companions.

---

[1] There was evidence that the defendant and one of the other individuals he was with were riding bicycles, while the third individual approached on foot.

The defendant and his friends made their way to a nearby street, where one of the teenagers sat on the hood of a parked motor vehicle while the defendant and the third individual sat on their bicycles. A short time later, the victim and his friends also left the park and approached the defendant's crew; a verbal confrontation ensued. Although the accounts of the encounter differed slightly, it appears that the defendant's group had been laughing at the victim and his friends, and one of the victim's friends asked the defendant and his friends if they had a problem. When this interaction began, the victim was not involved and instead was riding his bicycle nearby. The demeanor of the interaction intensified, with one member of the defendant's group proclaiming, "Brookline is a bunch of bitches." One of the victim's friends told the defendant and his friends to leave. When they did not leave, one of the victim's friends asked the defendant and his friends if they wanted to "shoot the fair ones," meaning have a fist fight. The defendant and his friends group declined, responding, "We don't fight fair." At this point, the victim got off his bicycle and stood by his friend who had been interacting with the defendant's group. The victim raised his hands as if ready to fight and told the defendant and his friends to "[g]et the fuck out of here." No punches were thrown, and the spat between the groups did not escalate beyond name-calling and posturing.

One of the defendant's friends suggested that they leave, warning the defendant that the victim might have a weapon. The defendant responded, "He doesn't know what I got." One of the defendant's friends responded to him, "Don't do anything stupid." At that point, the defendant and his crew turned away from the victim and his friends and began leaving; it appeared that the confrontation had ended.

The defendant rode his bicycle away from the victim and his friends. It took the defendant about fifteen seconds to ride in the vicinity of forty-five feet away from the victim and his friends. At that point, having moved away from the scene of the confrontation, the defendant, unprovoked, stopped and put his bicycle down. He turned to one of his friends and said, "Fuck that shit." The defendant then pulled out a handgun, cocked it, and began making his way back toward the victim. The victim had not moved, and his hands were in the air; he was not holding anything. The defendant stated, "I don't shoot the fair ones," pointed the handgun at the victim's chest, and fired. The bullet struck the victim in the center of his chest, passing through his left lung and heart before leaving his body. The victim collapsed nearby, bleeding profusely from his chest. The defendant ran away laughing. He and his friends fled the scene.

Police responded almost immediately and began performing first aid on the victim, but he died shortly after being shot.

No gun, and no other weapon, was found on or near the victim's person.

Later that night, the defendant bragged about the shooting, proclaiming that he was "the number one clapper," meaning that he was the number one shooter. The following day, the defendant telephoned one of his friends who was with him during the shooting and asked if the friend would travel with him to the Dominican Republic. His friend declined, and the defendant fled to New York, where he was apprehended three days later.

At trial, the defendant did not contest that he killed the victim; instead, he claimed that he was acting in self-defense. Defense counsel argued that the defendant believed the victim or one of the victim's friends was armed, and the defendant believed he was facing serious and imminent bodily harm. The jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation and possession of a firearm without a license.

2. Discussion. a. Motion for funds for an expert and a continuance. After several continuances, the defendant's trial was scheduled to begin on November 13, 2003.[2] On November 10, three days before trial, the defendant filed a motion for funds

---

[2] The defendant's trial was originally scheduled for October 14, 2003. On September 17, 2003, the trial date was continued and set for November 10, 2003. On October 24, 2003, the trial was further continued and set for November 13, 2003.

to hire an expert on adolescent brain development to evaluate the defendant and testify in his defense.[3]  When defense counsel filed this motion, she had been representing the defendant for approximately one and one-half years.  Although defense counsel sought funds to hire an expert on the eve of trial, she did not claim that she was unprepared for trial.  The trial judge construed the defendant's "motion for funds" as a motion for a continuance because granting the motion to hire an expert would necessitate a continuance of the trial by several months.

The defendant's motion generally asserted that an expert could evaluate the development of his brain by conducting a brain scan.  In the event the scan indicated that the defendant's brain was underdeveloped for purposes of decision-making and impulse control, the defendant could then argue, with the support of expert testimony, that he did not have the capacity to form the specific intent necessary to commit murder in the first degree on the theory of deliberate premeditation. In support of the motion, the defendant attached an article published by the National Juvenile Defender Center describing how the science of adolescent brain development had progressed considerably over the previous five years, and that the adolescent brain was generally less developed than previously

---

[3]  The defendant also filed a motion in limine to admit the expert testimony on adolescent brain development.

believed. The article further posited that adolescents with less developed brains tended to react with "gut instinct" rather than organized, reasoned thought. The defendant also included an article describing the technology used to scan the brain as having "a brilliant future in medicine, psychology, psychiatry, and in the neurosciences in general, for studying the relation between [brain] structure and function." There was nothing in the materials submitted in support of the defendant's motion indicating that all adolescent brains develop at the same rate, or that there was necessarily a direct correlation between an individual's age and his or her brain development. According to the defendant, brain development directly correlated to an adolescent's ability to control impulses, perform organized thought, and form specific intent.

A hearing on the defendant's motion took place the day before trial was set to begin. Defense counsel explained that she began Internet research the week prior, looking for possible ways to "break this case down from a murder to a manslaughter." In the course of this research, defense counsel discovered the materials describing the advances in the science of adolescent brain development that gave rise to the request for funds to hire an expert and a continuance. The article the defendant principally relied on had been published in April, 2003, approximately six months earlier. Defense counsel argued that

conducting scans of the defendant's brain could demonstrate the extent to which the defendant's brain was developed, which, in turn, could potentially indicate whether the defendant was more likely to think impulsively and whether he was capable of forming the specific intent to commit murder in the first degree.

The judge, who was aware of the advances in the science of adolescent brain development, acknowledged that the material submitted indicated that adolescents are "subject to these potential risks and dangers," but noted that "no study says that all juveniles develop in the same way," and that the studies had margins of error. Critically, the judge noted that the defendant failed to provide any information suggesting that the defendant fell within the group of adolescents identified in the literature. In other words, the defendant failed to submit sufficient evidence, such as psychological or behavioral studies, suggesting brain scans would provide useful information for the defendant's case. The judge also noted that although defense counsel had been representing the defendant for approximately one and one-half years, she raised this issue for the first time on the eve of trial. The judge's decision to deny the defendant's motion centered on the fact that the defendant had belatedly requested the continuance and failed to

substantiate that the defendant fell within the group of adolescents generally described by the studies.[4]

Because the judge's denial had nothing to do with the request for funds itself, but instead focused on the defendant's implicit request for a continuance, we consider whether the judge erred in denying the defendant's motion for a continuance.[5,6]  "Whether a motion for continuance should be granted lies within the sound discretion of the judge, whose

---

[4] In denying the defendant's motion for a continuance, the judge stated:

> "I don't think it would have been unreasonable at that time, a year-and-a-half ago, to immediately request funds for such an evaluation."

The judge further explained:

> "Here we are on the eve of trial, for the first time without specific supporting information, you're asking me, without the Commonwealth having the opportunity to rebut, get their own evidence, witnesses, whatever, for what essentially is a several months long, at least, continuance to be able to fully explore this to be fair to both sides. I don't think the motion is fairly raised at the right time without any supporting information.  And I'm going to deny it for those reasons."

[5] The defendant filed a posttrial motion to reduce the verdict and a renewed motion for funds to hire an adolescent brain development expert.  The trial judge denied both motions.

[6] The defendant filed a motion for reconsideration concerning the denial of the motion for funds and a continuance. The trial judge reiterated that the denial had nothing to do with the defendant's indigent status or the fact that the defendant had requested funds.  Rather, the judge denied the motion based on its lack of support and the belated timing of the motion given that counsel had been involved in the case for approximately fifteen months.

action will not be disturbed unless there is patent abuse of that discretion, which is to be determined in the circumstances of each case." Commonwealth v. Pena, 462 Mass. 183, 189 (2012), quoting Commonwealth v. Bettencourt, 361 Mass. 515, 517-518 (1972).  See Commonwealth v. Snell, 428 Mass. 766, 771-772 (1999), cert. denied, 528 U.S. 1106 (2000) (motion to continue filed ten days before trial seeking further deoxyribonucleic acid testing properly denied).  A judge considering a motion for a continuance may not exercise his or her discretion "in such a way that denial of a continuance deprives a defendant of the right to effective assistance of counsel and to due process of law."  Pena, supra at 190.  See Commonwealth v. Miles, 420 Mass. 67, 85 (1995) (counsel must have reasonable opportunity to prepare defense).  Although there is no "mechanical test" for determining whether the denial of a continuance constituted an abuse of discretion, Commonwealth v. Cavanaugh, 371 Mass. 46, 51 (1976), "we are guided by the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied" (citation and quotation omitted).  Commonwealth v. Cruz, 456 Mass. 741, 747 (2010).  See Commonwealth v. Caldwell, 459 Mass. 271, 285 (2011), quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964).  "A judge should grant a continuance only when justice so requires, balancing the requesting party's need for additional time against concerns

about inconvenience, cost, potential prejudice, and the burden of the delay on both the parties . . . ."  Commonwealth v. Melo, 472 Mass. 278, 305 (2015), quoting Commonwealth v. Ray, 467 Mass. 115, 128 (2014).  See Mass. R. Crim. P. 10 (a) (1), 378 Mass. 861 (1979) ("a continuance shall be granted only when based upon cause and only when necessary to insure that the interests of justice are served").  The judge must also consider the over-all administration of justice, and "give due weight to the interest of the judicial system in avoiding delays which would not measurably contribute to the resolution of a particular controversy."  Commonwealth v. Chavis, 415 Mass. 703, 711 (1993), quoting Cavanaugh, supra.

Based on the particular circumstances presented in the defendant's request for a continuance, we conclude that the judge did not abuse his discretion in denying the motion.  After representing the defendant for approximately one and one-half years, and having successfully moved for funds to hire a private investigator and a ballistics expert on April 30, 2003, defense counsel moved for what would amount to the functional equivalent of a continuance at least several months long, three days before trial.  Beyond the belated nature of this request, the defendant did not support the motion with information or evidence -- other than the defendant's age at the time of the offenses -- indicating that the requested brain scans would yield helpful

information.  Defense counsel did not present evidence concerning the defendant's medical, psychological, or behavioral history; school records; or any information suggesting that he was a particularly psychologically troubled adolescent who might fall within the group of adolescents described in the literature.  The defendant's motion relied exclusively on articles, which do not appear to be peer-reviewed medical or psychological studies or journals, that discuss generally the advancement of the science of adolescent brain development in the previous five years, and that argue that juvenile brains, in general, are less developed than adult brains.  In short, the defendant failed to support his motion with any evidence specific to him suggesting that a continuance to hire an adolescent brain development expert would furnish exculpatory evidence in his case.  See Snell, 428 Mass. at 772.

In support of his argument, the defendant focuses on our scientific and legal understanding of adolescent brain development as it exists in 2018, not the understanding of the science or law as it existed at the time of his trial in 2003. There is no question that our scientific and legal understanding of adolescent brain development has advanced since the defendant's trial.  See Miller v. Alabama, 567 U.S. 460, 479-480 (2012) (invalidating sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders

convicted of homicide offenses); Graham v. Florida, 560 U.S. 48, 75 (2010) (prohibiting life sentence without possibility of parole for juveniles convicted of nonhomicide offenses); Roper v. Simmons, 543 U.S. 551, 578 (2005) (invalidating death penalty for juveniles).  See also Commonwealth v. Okoro, 471 Mass. 51, 59-60 (2015); Diatchenko, 466 Mass. at 658.  It is now well established, based on "science, social science, and common sense," that adolescents are significantly different from adults for purposes of analysis under the Eighth Amendment to the United States Constitution.  Diatchenko, supra at 660, citing Miller, supra at 471.  See Okoro, supra ("[s]cientific and social science research on adolescent brain development and related issues continues").  Therefore, our acknowledgement that adolescents are constitutionally different from adults has been precisely limited to our consideration of juvenile sentencing, not whether a juvenile defendant is capable of committing murder.  See Okoro, supra; Diatchenko, supra at 659-660.  See also Commonwealth v. Perez, 477 Mass. 677, 682-683 (2017); Commonwealth v. Brown, 474 Mass. 576, 590 n.7 (2016) (holding of Miller focuses on "prohibition against cruel and unusual punishment under the Eighth Amendment . . . as it applied to sentencing and punishment of juveniles," and did not address "intent, knowledge, or deliberate premeditation as elements of a crime"); Commonwealth v. Ogden O., 448 Mass. 798, 804 (2007)

("While a delinquent child may not have the maturity to appreciate fully the consequences of his wrongful actions . . . , that does not mean that a delinquent child lacks the ability to formulate the specific intent to commit particular wrongful acts").  But see Okoro, supra at 65-66 (trial judge was correct in both allowing expert testimony concerning that particular juvenile defendant's "capacity for impulse control and reasoned decision-making on the night of the victim's death," and precluding expert from suggesting that "it was impossible for anyone [fifteen years old] to formulate the necessary intent to commit [murder in the second degree]").

Despite these changes in the science and law as they relate to juvenile sentencing, we do not impute our contemporary legal or scientific understanding of adolescent brain development in evaluating whether the trial judge abused his discretion by denying the defendant's motion for a continuance on the eve of trial in 2003.[7]  Instead, "we are guided by the circumstances

---

[7] On appeal, the defendant does not claim that the advancements in adolescent brain development since his trial constitute newly discovered evidence.  See Commonwealth v. Grace, 397 Mass. 303, 306 (1986) (evidence is newly discovered where it was "unknown to the defendant or his counsel and not reasonably discoverable" through "reasonable pretrial diligence").  Similarly, the defendant's appellate counsel, who was not the same counsel representing him at trial, stated at oral argument that he considered raising a claim of ineffective assistance of trial counsel, but ultimately chose not to raise the claim because, in 2003, lawyers who commonly represented defendants in murder trials were not aware of the issues

present in [this] case" (citation and quotation omitted), Cruz, 456 Mass. at 747, reflecting the law and general understanding of adolescent brain development in 2003, Commonwealth v. Lally, 473 Mass. 693, 704-705 (2016) (concluding that although scientific guidelines had changed, method used at trial was "reliable method . . . at the time of trial").  See Commonwealth v. Bastaldo, 472 Mass. 16, 31 (2015) ("we evaluate the alleged errors under the existing law at the time of trial"); Commonwealth v. Crayton, 470 Mass. 228, 245 (2014) (judge did not abuse discretion where decision "was in accord with the case law existing at the time of her decision").  See also Commonwealth v. LeFave, 430 Mass. 169, 181 (1999) (discussing "conflict between the constantly evolving nature of science and the doctrine of finality").

From the circumstances presented here, notably the defendant's failure to substantiate his request with specific evidence -- other than his age -- the defendant failed to make a "case-specific argument for granting a continuance at that juncture."  Ray, 467 Mass. at 129.  See Cruz, 456 Mass. at 748 (no abuse of discretion in denying motion for continuance where "defendant failed to provide a persuasive reason for a

concerning adolescent brain development, particularly prior to Roper v. Simmons, 543 U.S. 551, 578 (2005).  After a full review of the record before us on appeal, we cannot say that counsel was ineffective.

continuance and instead relied on general assertions that the
defense could 'benefit' from more time").  Viewing the evidence
presented by the defendant in his motion for funds and for a
continuance in light of the science in 2003, and its acceptance
in our legal system, it is unlikely that a delay could have
measurably contributed to the fair resolution of the case.  Ray,
supra, citing Miles, 420 Mass. at 85.  The judge's decision was
not a "myopic insistence upon expeditiousness in the face of a
justifiable request for delay."  Pena, 462 Mass. at 190.
Instead, it reflected careful examination of the circumstances
presented, particularly the lack of support offered to
substantiate the request for a continuance.  See Cruz, supra.[8]
Accordingly, we affirm the trial judge's denial of the
defendant's motion for a continuance.

    b.  Sufficiency of the evidence of premeditation.  The
defendant contends that the evidence in his case indicates
spontaneity rather than deliberate premeditation, and therefore,

---

    [8] Even under the case law as it exists today, it is far from
clear that a similar motion, three days before trial, would be
allowed on this record -- a record devoid of evidence concerning
this particular defendant's psychological or behavioral status
or evidence suggesting that a scan of his brain would furnish
helpful evidence.  See Commonwealth v. Okoro, 471 Mass. 51, 66
(2015) (expert testimony admissible concerning particular
juvenile defendant's "capacity for impulse control and reasoned
decision-making on the night of the victim's death" because it
"did not amount to an opinion that the defendant [or any other
fifteen year old] was incapable of forming the intent required
for murder in the first or second degree simply by virtue of
being fifteen").

that we should exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce his verdict from murder in the first degree to murder in the second degree or manslaughter.  Pursuant to G. L. c. 278, § 33E, our duty is "to consider broadly the whole case on the law and the facts to determine whether the verdict is consonant with justice" (citation and quotation omitted).  Commonwealth v. Howard, 469 Mass. 721, 747 (2014).  In undertaking this duty, we may, "if satisfied that the verdict was against the law or the weight of the evidence . . . or for any other reason that justice may require[,] . . . direct the entry of a verdict of a lesser degree of guilt."  G. L. c. 278, § 33E.

We begin by noting that "a primary consideration" in determining whether a conviction of murder in the first degree based on deliberate premeditation is consonant with justice "is whether the killing reflects spontaneity rather than premeditation" (citation and quotation omitted).  Commonwealth v. Ruci, 409 Mass. 94, 98 (1991).  In order to prove deliberate premeditation, the Commonwealth must show that "the plan to kill was formed after deliberation and reflection.  However, no particular length of time is required in order for deliberate premeditation to be found."  Commonwealth v. Bolling, 462 Mass. 440, 446 (2012), quoting Commonwealth v. Caine, 366 Mass. 366, 374 (1974).  "The law recognizes that a plan to murder may be

formed within a few seconds." Commonwealth v. Chipman, 418 Mass. 262, 269 (1994). See Commonwealth v. Rakes, 478 Mass. 22, 34 (2017) ("No particular length of time of reflection is required to find deliberate premeditation, and the decision may be made in only a few seconds"). To prove deliberate premeditation, the Commonwealth must demonstrate that the defendant had the opportunity to reflect, however brief, and actually reflected on the decision to kill. See Commonwealth v. Bins, 465 Mass. 348, 367 (2013). "As such, it is the sequence of the thought process rather than the time which is taken to think that is the key to determining whether someone acted with deliberate premeditation." Chipman, supra, citing Commonwealth v. Tucker, 189 Mass. 457, 494-495 (1905) (this thought process is often characterized as "[f]irst the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution").

In Commonwealth v. Colleran, 452 Mass. 417, 431-432 (2008), we set forth a number of factors to consider in deciding whether a defendant's conviction of murder in the first degree based on deliberate premeditation should be reduced. "Each case depends on its peculiar facts. No one fact is conclusive." Id. at 432, quoting Commonwealth v. Gaulden, 383 Mass. 543, 556 (1981). The defendant contends that the circumstances of his case embody

each of the mitigating factors enunciated in Colleran, supra at 431-432.  A careful review of the record belies this contention.

There was a brief verbal spat between two groups of teenagers.  No punches were thrown.  The interaction, although hostile, only consisted of name-calling and posturing.  The squabble between the two groups ended, and the defendant turned away from the victim, got on his bicycle, and began to ride away.  After having traveled approximately forty-five feet, the defendant stopped his bicycle and exclaim to his friend, "Fuck that shit."  At that point, he then took out a handgun, cocked it, walked back toward the victim, and shot him in the chest.

The circumstances here indicate that the defendant did not shoot the victim in the midst of a senseless brawl or in the heat of sudden combat.  It was reasonable for the jury to conclude that the defendant had time to reflect as he was riding away from the scene, and that his statement, "Fuck that shit," before cocking the gun and walking back toward the victim, evinced that the defendant had an opportunity to reflect, actually reflected on the situation, and formed the intent to kill before shooting the victim.  In addition to a period sufficient for the defendant to have "cooled off" and formed the intent to kill, the events here also show that the defendant left the scene of the altercation and returned with the weapon with the intent to kill the victim.  See Commonwealth v. Taylor,

463 Mass. 857, 870 (2012) (where ample time to cool off after fight but defendant returned to victim's house with firearm and shot victim, killing not in heat of passion); Commonwealth v. Jiles, 428 Mass. 66, 75 (1998) (defendant went to scene of crime with loaded gun for purposes of shooting suspected rival gang members).  Cf. Commonwealth v. Jones, 366 Mass. 805, 809 (1975) (defendant was reasonably in fear of sudden attack by victim with razor blade immediately prior to killing).

There is no question that this was a minor controversy that exploded into the killing of a human being.  See Commonwealth v. Baker, 346 Mass. 107, 109-110 (1963).  See also Commonwealth v. Vargas, 475 Mass. 338, 364 (2016).  It is also true that the defendant and the victim were strangers to each other and there was no indication of prior trouble between them.  See Commonwealth v. Ransom, 358 Mass. 580, 583 (1971).  The defendant was also sixteen at the time he shot and killed the victim.  See Brown, 474 Mass. at 592 (upholding seventeen year old's conviction of murder in first degree based on deliberate premeditation).  Indeed, the prosecutor acknowledged the defendant's age in his closing argument:  "[O]ne of the factors in this case that you have to think about -- and I think I have to mention it, is how old [the defendant] was at the time -- sixteen years, sixteen years, ten months old.  That's young.  That's young.  You will decide what to do."  Closing arguments

are not evidence, but the prosecutor's statement reflects that the defendant's age was known to the jury, and that fact was available for their consideration. Although the defendant's age is not dispositive, the jury were free to consider the defendant's age in determining the extent of the defendant's guilt. See Okoro, 471 Mass. at 66 (expert testimony concerning adolescent brain development admissible to assist jury in "determining whether the defendant was able to form the intent required for deliberate premeditation . . . at the time of the incident"). However, in these circumstances, the defendant's age does not outweigh the compelling evidence that his actions were the product of deliberate premeditation, not spontaneity. Accordingly, we decline to exercise our authority under G. L. c. 278, § 33E, to reduce the defendant's conviction of murder in the first degree based on deliberate premeditation.

c. Court room closure claim. The defendant avers that his right to a public trial under the Sixth Amendment to the United States Constitution was violated because during jury empanelment the trial judge conducted individual voir dire of the jurors in a court room that was not open to the public. During the final pretrial conference, defense counsel specifically requested that the judge conduct individual voir dire of the jurors for purposes of asking questions related to self-defense. The judge allowed the request and set forth the procedure he intended to

use for conducting the voir dire:  After asking general questions of the venire in the court room where the case was being tried, prospective jurors would be individually brought into an adjacent court room and questioned by the trial judge in the presence of the defendant, counsel for both sides, and the court reporter.  After the judge outlined this proposed procedure, defense counsel agreed to it and thanked the judge for accommodating her request for individual voir dire.  Jury empanelment and the individual voir dire occurred exactly as the judge and defense counsel had agreed on at the final pretrial conference.  Moreover, counsel and the defendant were present for the individual voir dire procedure and did not object.

Where defense counsel not only requested individual voir dire and agreed to the individual voir dire procedure used in this case, but also was present for it and did not raise a contemporaneous objection, we conclude that the defendant did not preserve his court room closure claim.  Commonwealth v. Robinson, 480 Mass. 146, 154 (2018).  See Ray, 467 Mass. at 121-122 (public trial right waived where "[c]ounsel for the Commonwealth and the defendant affirmatively agreed to the procedure"); Commonwealth v. Dyer, 460 Mass. 728, 734, 736-737 (2011), cert. denied, 566 U.S. 1026 (2012) (defendant waived right to public trial by consenting to individual juror voir dire in judge's chambers).  The defendant has failed to advance

any grounds supporting his contention that the individual voir dire procedure used in his case created a substantial likelihood of a miscarriage of justice or otherwise resulted in a fundamentally unfair empanelment procedure.  See Weaver v. Massachusetts, 137 S. Ct. 1899, 1909-1910, 1912 (2017).

d.  Relief under G. L. c. 278, § 33E.  The defendant was sixteen years old at the time of the crime.  After conviction, he received the mandatory sentence for murder in the first degree under G. L. c. 265, § 2 -- life without the possibility of parole.  Pursuant to our holding in Diatchenko, 466 Mass. at 658-659, the defendant's life sentence remains in force, but the exception then present in G. L. c. 265, § 2, rendering him ineligible for parole, is no longer applicable.  Commonwealth v. Brown, 466 Mass. 676, 688-689 (2013), S.C., 474 Mass. 576 (2016).  Accordingly, we affirm the defendant's convictions of murder in the first degree and carrying a firearm without a license, and affirm the order denying the defendant's motion for a new trial, but remand for resentencing consistent with Diatchenko, supra.  We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E, and conclude that there are no grounds for reversing the defendant's convictions or for granting any other relief.

So ordered.